[L. A. No. 20790.   In Bank.   Aug. 25, 1949.]

IRENE DILLARD et al., Appellants, v. GENERAL JACK-
SON McKNIGHT et al., Defendants; JAMES A.
BOWER et al., Respondents.

Dana Williams and Kenneth Sperry for Appellants.

Arthur C. Fisher for Respondents.

SPENCE, J.—Plaintiffs' son died on July 24, 1941, as the result of injuries sustained by him four days earlier in a collision between a Pontiac coupe in which he was a passenger and a Studebaker automobile then being operated by one McKnight in an allegedly negligent manner. To recover damages for their son's death, plaintiffs in September, 1941, instituted the instant action against said McKnight; his employer, J. F. Wilcox; the owner of the Studebaker automobile, W. J. Neville; Thorley Oil Company; and several fictitiously named defendants. On August 11, 1942, the cause went to trial as to certain defendants on the first amended complaint and at the conclusion thereof, a motion for a nonsuit was granted as to defendant Thorley Oil Company. Judgment was then ordered "for the plaintiffs against the defendants General Jackson McKnight and J. F. Wilcox in the sum of $7500.00 and . . . in favor of the defendant W. J. Neville." The court found, among other things, that "at all times herein mentioned, defendant GENERAL JACKSON McKNIGHT was the agent, servant, and employee of the defendants herein, and that he was acting within the scope of his employment as such agent, servant and employee." Accordingly, on September 2, 1942, judgment was entered in plaintiffs' favor as indicated; it became final, and execution thereon was returned unsatisfied.

As the result of certain evidence adduced upon the 1942 trial, plaintiffs claim to have learned for the first time the identity of James A. Bower and Robert A. Thorley as proper parties to this action. Accordingly thereafter, service of process was made upon them in pursuance of their fictitious designations as Doe IV and Doe V, respectively, and on August 16, 1946, plaintiffs' first amended complaint herein was amended to show their true names. On September 12, 1946, the cause went to trial for the second time before the same judge. At the conclusion of this second trial, it was found by the court that the automobile collision was the "direct and proximate result of the negligence of the defendant General Jackson McKnight"; that on the day of the accident said "defendant General Jackson McKnight was employed by the defendants J. F. Wilcox, Robert A. Thorley, and James A. Bower as a driller" on a certain oil well but "at the time" in question he "was not acting within the scope of his employment." Accordingly, judgment in favor of defendants Bower and Thorley was entered on December 27, 1946; and plaintiffs appeal therefrom.

In taking their appeal, plaintiffs properly note that "all

of the findings of the trial court were favorable to the plaintiffs, with the exception of the finding that the defendant McKnight was not acting within the scope of his employment at the time of the accident." Their challenge of the propriety of this single adverse finding—the "only" one which "supports the judgment" on the second trial—rests on these two considerations: (1) that the "former judgment herein, wherein it was found that the defendant McKnight was acting within the scope of his employment as an employee of the defendant J. F. Wilcox, is res adjudicata and conclusive of that issue as against the defendants Robert A. Thorley and James A. Bower . . . co-partners and joint employers of the defendant McKnight"; and (2) that the "findings of the trial court with respect to whether the defendant McKnight was acting within the scope of his employment at the time of the accident are contrary to the undisputed evidence in the case." Plaintiffs' position cannot be sustained in the light of the record and the legal principles applicable thereto.

It is undisputed that in the "first part of July," 1941, defendant Wilcox was drilling an oil well close to the corner of Main Street and Sepulveda Boulevard, near the town of Lomita, in the county of Los Angeles; that defendant Bower helped finance the venture on a "50-50" basis, and that they ran out of money; that thereupon they began negotiations with defendant Thorley, who operated a producing oil well located on certain property which he owned in the city of Los Angeles; that as a result of these negotiations defendant Thorley invested some money in the "Wilcox well" and on July 14, 1941, as a limited partner executed Articles of Limited Partnership (which were never filed or recorded [Civ. Code, § 2478, subd. (1) (b)]) in connection with such investment; that six days later—July 20, 1941—defendant McKnight, who was then, and theretofore had been, employed as a "driller" by defendant Wilcox, became involved in the accident heretofore mentioned.

Plaintiffs first argue the significance of the established partnership undertaking in relation to the principle of res judicata as a factor in the second trial. That principle precludes parties or their privies from relitigating an issue that has been finally determined by a court of competent jurisdiction. (1 Freeman on Judgments (5th ed.) § 407, p. 887; 2 Black on Judgments (2d ed.) § 504, p. 764; 50 C.J.S., Judgments, § 592, p. 11; 15 Cal.Jur., Judgments, § 166, p. 97.)

■ It rests upon the sound public policy that there must be an end of litigation and accordingly, persons who have had one fair trial on an issue may not again have it adjudicated. (*Ibid.*) So it is stated as "an elementary principle, recognized by [our] code [Code Civ. Proc., § 1908, subd. 2], that a judgment or order is operative not only upon parties but to the same extent upon their privies." (15 Cal.Jur., Judgments, § 220, p. 191.) ■ But the application of the principle of res judicata in a given case depends upon an affirmative answer to these three questions: Was the issue decided in the prior adjudication identical with the one presented in the subsequent litigation? Was there a final judgment on the merits? Was the party against whom the principle is invoked a party or in privity with a party to the prior adjudication? (*Bernhard* v. *Bank of America*, 19 Cal.2d 807, 813 [122 P.2d 892].)

There is no dispute here, of course, as a matter of record, that the issue of defendant McKnight's scope of employment in relation to the happening of the accident in question was completely adjudicated incident to the entry of judgment against defendant Wilcox at the conclusion of the first trial in this action, and that such judgment has long since become final, but the third essential element relative to the identity of the parties does not appear. ■ It is generally recognized that partners are not in such privity with one another that a judgment against one partner in an action brought against him personally on a tort arising out of the partnership business is res judicata when the same issues are raised in subsequent litigation against another partner. (1 Freeman on Judgments (5th ed.) § 518, p. 1112; 2 Black on Judgments (2d ed.) § 566, p. 852; 50 C.J.S., Judgments, § 806, pp. 351-352; *Tonge* v. *Item Pub. Co.*, 244 Pa. 417 [91 A. 229, 231-232]; *Liebert* v. *Reiss*, 174 App.Div. 308 [160 N.Y.S. 535, 536]; *Emmons* v. *Hirschberger*, 69 N.Y.S.2d 401, 402; *Pate* v. *Geo. P. Wyly & Co.*, 118 Ga. 262 [45 S.E. 217, 218]; *Robinson* v. *Seay*, 175 Mo.App. 713 [158 S.W. 409, 412-413]; *Ablon* v. *King* (Tex.Civ.App.), 279 S.W. 563, 566; *American Photo Player Co.* v. *Simon*, 151 La. 708 [92 So. 307, 308]; *cf.*, Cal. Civ. Code, § 2403, subd. (3) (d), (e).) If the rule were otherwise a partner would be required to discover at his peril any action against his copartner that might conceivably relate to the partnership business and seek to intervene therein. On the second trial the only issue that would be open would be the nature of his relationship to the party

sustaining the adverse judgment. Such procedure would deprive him of valuable rights contrary to "the mandate of due process of law"—that no person can be affected by a hearing or adjudication of a court of justice without his voluntary appearance or affording to him by means of the service of process an opportunity to appear and contest the claim that may be made against him. (See *Bernhard* v. *Bank of America, supra,* 19 Cal.2d 807, 811, and authorities there cited.)

Consistent with these observations is "the accepted rule that in no case will a judgment entered after service on less than all the partners be given the effect of a personal judgment against partners not actually served." (*Ellsworth* v. *Bradford,* 186 Cal. 316, 319 [199 P. 335], and authorities there cited.) Thus it was said in the early case of *Ingraham* v. *Gildemeester,* 2 Cal. 88, at pages 89-90, in response to the assertion that "service upon one partner, is service upon all": "Such is not the rule in this State. To sustain a judgment against a defendant, he must be served with process, or brought into Court through some of the forms of law." (See, also, *Golden State & Miners' Iron-Works* v. *Davidson,* 73 Cal. 389, 392-393 [15 P. 20].)

It is true, as plaintiffs argue, that while the term "privity" has been defined as envisaging "an interest in the subject matter" of the litigation acquired "after rendition of the judgment . . . through or under one of the parties, as by inheritance, succession, or purchase" (*Bernhard* v. *Bank of America, supra,* 19 Cal.2d 807, 811; see, also, *Servente* v. *Murray,* 10 Cal.App.2d 355, 360-361 [52 P.2d 270]), it has also been correlated with a broader concept consistent with "careful examination into the circumstances of each case as it arises." (30 Am.Jur., Judgments, § 225, p. 957.) So it is said in 50 Corpus Juris Secundum, Judgments, section 788, at pages 324-325, that under "many decisions, privity means a mutual or successive relationship to the same rights of property, or such an identification in interest of one person with another as to represent the same legal rights, and the term 'privy' when applied to a judgment or decree refers to one whose interest has been legally represented at the trial." As illustrative of this concept, plaintiffs refer to the recent case of *Zaragosa* v. *Craven,* 33 Cal.2d 315 [202 P.2d 73], wherein this court determined that a "privity" of relationship existed between a husband and wife so as to make an adverse judgment in a prior action brought by the husband to recover

for personal injuries sustained by him in an automobile accident res judicata as to the same issues when raised in a later action brought by the wife on account of personal injuries which she sustained in the same accident. But that conclusion was based upon the community property law of this state—that ''[t]he right, or cause of action, involved in [the husband's] prior litigation was community in nature and the proceeds of any judgment that might have been recovered from defendant would have belonged to both husband and wife, as community property . . . the husband was representing the community . . . and consequently the wife was also represented as to her interest in the community and is bound by the [prior adverse] judgment.'' (P. 321.) █ Manifestly as so analyzed, such decision (to like effect, see *Cutting* v. *Bryan,* 206 Cal. 254, 258 [274 P. 326]) is in nowise analogous to the present situation involving partners sued in their individual capacities and entitled, under the requirements of ''due process of law,'' to ''notice and an opportunity to be heard'' before being deprived of valuable ''property rights by a judgment.'' (*Bernhard* v. *Bank of America, supra,* 19 Cal.2d 807, 811.) Plaintiffs have cited us no case holding to the contrary in the matter of individual partners sued on a tort liability arising out of a partnership transaction, and our independent research has revealed none.

█ Of course, there are situations where persons neither parties nor privies to parties to an action may be bound by a judgment. The rule is stated in section 84 of the Restatement of Judgments as follows: ''A person who is not a party but who controls an action, individually or in co-operation with others, is bound by the adjudications of litigated matters as if he were a party if he has a proprietary or financial interest in the judgment or in the determination of a question of fact or of a question of law with reference to the same subject matter or transaction; if the other party has notice of his participation, the other party is equally bound.'' (See, also, 1 Freeman on Judgments (5th ed.) § 432, p. 939 et seq.; 50 C.J.S., Judgments, §§ 782-783, pp. 317-320.) █ In urging the binding effect of the first trial's findings and judgment against defendants Bower and Thorley on the second trial, plaintiffs appear to rely in part upon a claim of their exercise of control over the defense in the prior litigation. Thus, plaintiffs argue that from the record it may be inferred that defendants Bower and Thorley, through their correspondence with defendant Wilcox' counsel at the time of the first trial,

knew of plaintiffs' cause of action as involving the responsibility of the partnership and so were in an equal position of authority to exercise control over the conduct of such proceedings consistent with their joint and several liability on a partnership matter (Civ. Code, §§ 2407, 2409]; that they chose to stay "in the background" and let defendant Wilcox, as agent of the partnership (Civ. Code, § 2403) "bear the brunt of the defense," so that "they are now estopped to deny the force and effect of the [first] judgment." Plaintiffs claim the situation is analogous to that of an "undisclosed principal," who is bound by a judgment in a prior action rendered against his agent on the identical issue when raised in subsequent litigation, citing *Shamlian* v. *Wells*, 197 Cal. 716 [242 P. 483]; also, 30 Am.Jur., Judgments, § 248, p. 977.

But the frailty of plaintiffs' position in this respect arises from their failure to urge the claim of res judicata until they moved unavailingly for a new trial herein, and at no time in the proceedings of the second trial did plaintiffs put in issue the question of the participation of defendants Bower and Thorley in the conduct of the prior litigation. Neither Bower nor Thorley nor the partnership was named as a party to the action as it was prosecuted through the first trial and culminated in a judgment against defendant Wilcox, and defendants Bower and Thorley in the second trial might have been able to prove that they did not participate in the conduct of the prior defense or agree to have their copartner Wilcox conduct it for them had plaintiffs attempted to prove that they did. The entire matter of such alleged participation and exercise of control would be a question of fact to be resolved from the evidence adduced thereon, and defendants Bower and Thorley would be entitled to have their day in court in challenge of such charge by plaintiffs. (See 4 Jones' Commentaries on Evidence (2d ed.) § 1810, p. 3351 et seq.) Otherwise, to follow plaintiffs' theory, mere knowledge of one partner that his copartner is being sued on an alleged partnership transaction would be sufficient to render the first judgment res judicata on all issues litigated, if in the subsequent prosecution of the action against the later-served partner proof is made of the relationship he sustained to the party-defendant in the prior trial. Such an extension of the doctrine of res judicata cannot be reconciled with the requirements of due process as above discussed. Nor does plaintiffs' citation of the case of *Shamlian* v. *Wells, supra,* 197 Cal. 716, sustain their position. There the undisclosed principal undertook to justify

his occupancy of plaintiffs' land on the basis of a contract made with his agent. The contract had been terminated in an action to which only the agent was a party. It was held that the undisclosed principal could not attempt to reap the benefit of his agent's contract and at the same time deny that his agent represented him in litigation concerning it. Defendants Bower and Thorley are not seeking to take advantage of a contract made by defendant Wilcox as a secret agent and at the same time disclaim liability for his acts performed in connection therewith. Rather their concern would only be with their right to secure their day in court on the issue of whether defendant McKnight was acting in the scope of his employment when he injured plaintiffs' son. Such right could not be denied them in the absence of plaintiffs' showing of an estoppel against them in the course of the second trial.

Nor does it avail plaintiffs to rely on the principle of judicial notice in support of their present plea of res judicata. While a trial court is bound to take judicial notice of its own records in the same action (20 Am.Jur., Evidence, § 86, p. 104; 10 Cal.Jur., Evidence, § 52, p. 728; *Craiglow* v. *Williams,* 45 Cal.App. 514, 516 [188 P. 76]; *Schomer* v. *R. L. Craig Co.,* 137 Cal.App. 620, 627 [31 P.2d 396]; *Mason* v. *Drug, Inc.,* 31 Cal.App.2d 697, 701 [88 P.2d 929]; *In re Reader,* 32 Cal.App.2d 309, 313 [89 P.2d 654]), and matters which are subject of judicial notice are not dependent upon either pleading or proof for their effectiveness in the determination of issues before the court (20 Am.Jur., Evidence, § 25, p. 54; 10 Cal.Jur., Evidence, § 25, p. 698; *Altoona Quicksilver Mining Co.* v. *Integral Quicksilver Mining Co.,* 114 Cal. 100, 103 [45 P. 1047]), the judgment entered against defendant Wilcox upon the conclusion of the first trial did not operate as a matter of law to conclude the rights of his copartners, defendants Bower and Thorley. As so viewed, the situation here is akin to that existing when the former judgment, available in bar of the retrial of an issue, was entered not in the same, but in a different action, and proper evidence in proof of its effectiveness as a prior adjudication must be made in the trial of the subsequent action or the benefit will be held to have been waived. (50 C.J.S., Judgments, § 836, p. 404; see, also, *Johnston* v. *Ota,* 43 Cal.App.2d 94, 97 [110 P.2d 507].) The record here shows that the trial judge was, in fact, fully aware of the earlier findings and determination of the scope of employment issue incident to the entry of the judgment against defendant Wilcox at the conclusion of the first trial.

but that he viewed the matter in the second trial as one for independent decision upon the evidence there adduced pursuant to plaintiffs' undertaking to try the entire cause anew. Accordingly, he remarked: "No, I do not think it [the evidence] was exactly the same. I think we have had some different testimony and some testimony that wasn't in the other case . . . there was quite a bit of testimony in that other case that is not in this . . . I cannot see it your [plaintiffs'] way. I do not think he [McKnight] was within the scope of his authority." ██ Where a party joins issue on a question previously litigated or voluntarily opens an investigation of matters which he might claim to be concluded by a prior judgment, he will be held to have waived his right to assert the benefit of the former adjudication and the case will be determined without regard therefor. (50 C.J.S., Judgments, § 597, p. 15; *Cooley* v. *Snake River Dist. Impr. Co.*, 78 Ore. 384 [152 P. 1190, 1192]; see, also, 2 Freeman on Judgments (5th ed.) § 808, p. 1715; *Domestic & Foreign Petroleum Co., Ltd.* v. *Long*, 4 Cal.2d 547, 562-563 [51 P.2d 73]; *Rideaux* v. *Torgrimson*, 12 Cal.2d 633, 638 [86 P.2d 826]; *Wolfsen* v. *Hathaway*, 32 Cal.2d 632, 638 [198 P.2d 1].) So here, in any event, plaintiffs' attempt to assert the binding effect of the first judgment against defendants Bower and Thorley in the second trial, and thus conclude their right to an independent adjudication of the issues presented by the pleadings, comes too late.

██ There now remains for consideration plaintiffs' contention that the findings of the trial court with respect to whether defendant McKnight was acting within the scope of his employment at the time of the accident are contrary to the undisputed evidence in the record, and that they are therefore wholly unsupported.

It appears that one Bob Hickerson, pursuant to the suggestion of defendant Thorley made shortly after entry into the joint enterprise in question, was placed in charge of the drilling operations at the Wilcox well. Sometime during the four years intervening between the first and second trials said Hickerson died and his testimony in the first trial was not submitted for inclusion in the present record. The only evidence on the scope of employment issue is the testimony of defendant McKnight, called as a witness for plaintiffs. He stated that he was employed as a "driller" on the Wilcox well and that he took his "orders" from Bob Hickerson, his

immediate superior; that he worked an eight-hour shift and on July 20, 1941, the day of the accident, he went on duty at 4 p. m.; that they were then "short a derrick man" and that he so told Hickerson, who then said: ". . . well, go ahead, that he [Hickerson] didn't know where to get one, if I knew where to get one to hire him . . . any time I could find one, any time one come around to hire him, that it was all right with him."

It further appears from defendant McKnight's testimony that when Hickerson "started to leave" the well at about "7:30 or 8:00 p. m." he found that "he could not get his car started"; that then McKnight, at Hickerson's direction and using the car of one Jack Neville, another employee at the well, "pulled him [Hickerson]" to two service stations; that "there was no mechanic" at either station; and that sometime "between 9:00 and 10:00 p. m." McKnight left Hickerson and the latter's car at the Thorley Oil Company well in Los Angeles, some "eight or nine miles" from the Wilcox well. Before they parted Hickerson gave McKnight certain instructions to carry to the driller who was to come on duty at midnight. McKnight left Hickerson with the intention of returning to the Wilcox well. As he drove along the road, he discovered that he had "missed the Main Street crossing . . . didn't see the sign"—"the lights were not very good on the car"—and he said he then decided to drive first to a hotel where he believed he could find a derrick man to employ, before going "back to the well." He claimed that he made no stops, except at boulevard signals, "between the time [he] unhooked [his] car from Mr. Hickerson's truck until the . . . accident," which occurred about 10 p. m. He was "knocked unconscious as a result of the accident," and he said that he "came to . . . in the Los Angeles County Jail." When asked as to whether he had "had any drinks, any alcoholic drinks" on the day of the accident, he answered that he had "five or six coke highballs" around "12:00 or 1:00 p. m."—"before [he] got on the job" but none later. Amplifying this point and in response to the query as to whether he had "ever been convicted of a felony," he stated: "Yes . . . in connection with this accident." Then in response to several further questions, he testified that he was "imprisoned in the county jail . . . a straight jail sentence [of] a year" but he "never spent any time in the State Prison"; that "they got [him] on three heads, negligent homicide, hit and run, and drunk driving." Thereupon the

trial judge stated that "it wasn't a felony," that "the record [would] be corrected" as obviously "he [the witness] does not know whether it was a felony . . . it's a legal question"; and when counsel for defendant Thorley then said that "it [was] agreeable with [him] that the question and answer be stricken," the trial judge so ruled.

During the two or two and one-half hours he was assertedly driving in the evening of July 20, 1941, McKnight was not sure "how far" he traveled but apparently counsel agree it was about "ten" miles, as the route was traced on the map introduced in evidence by plaintiffs as follows: 7.6 miles in towing Hickerson's car from the Wilcox well to the place where he left the latter in Los Angeles, at the Thorley Oil Company well; and then 2.4 miles to the scene of the accident. After hearing the evidence, the trial judge said: "I do not think he [McKnight] was within the scope of his authority and he had definite instructions to go back to the lease [the Wilcox well] and when the time came for the new driller to come on the morning tour to tell him how many points to keep the pressure on. From the time he went on duty and the time the accident happened, which was around 10:00 o'clock, I am satisfied there must have been several hours in there he cannot very well explain. I think he was out drinking during that time, because he obviously was drunk, and was so found by the Court, at the time of the accident. . . . that is the conclusion that I am drawing from the evidence, that he was drunk and that he was not doing anything within the scope of his authority. In fact he was told to go back to the lease [the Wilcox well], and it was obvious that he was to pick up the roughneck [the derrick man] at some other time or any time when he would go by there, either that one or another one—from his own testimony. I cannot see where he was in the business of the partnership at that time. . . I find that he was on his own and he was undoubtedly drinking and he wasn't doing any of the business that he was supposed to be doing. In fact, he was told by Mr. Hickerson to come back to the lease [the Wilcox well] and he intended to come back [there] himself. He said that both times he was on the witness stand, and I think he must have had a few drinks after he left Mr. Hickerson and prior to the time he says he got lost. I think that was probably the reason he got lost, and the Court finds against the plaintiffs" on that "one issue of [whether McKnight was] acting within the scope of his employment."

It is manifest that the trial judge concluded from the evidence that McKnight at the time of the accident had deviated from the scope of his employment and was then pursuing not his employer's, but his own interests in stopping for drinks along his line of travel instead of taking the route which would return him to the Wilcox well as Hickerson had instructed him. Plaintiffs argue that such conclusion fails to take into account McKnight's testimony that Hickerson earlier that day had requested him to "hire" a "derrick man" at "any time [he] could find one"; that such instruction contemplated that he was to make the necessary arrangements at his convenience; that it was only after he became "lost" by reason of the poor headlights on the car that he decided to take advantage of the opportunity presented by driving to the hotel in search of the needed derrick man and endeavoring to have the latter come to work at the Wilcox well "the next evening if . . . not . . . that night"; and that he then intended himself to "go back to the [Wilcox] well." But apparently, in the light of McKnight's own account of the relevant circumstances surrounding the accident, the trial judge deemed it significant that as McKnight left Hickerson that night, the latter gave him certain orders for the crew due at midnight at the Wilcox well but "didn't say anything . . . about a derrick man"; that Hickerson intended McKnight to "hire" another man "any time one come around" the well, but not to undertake any special trip for that purpose; that it was not until he "lost" his way that McKnight decided to disobey Hickerson's instructions to return to the Wilcox well and turned aside to his own interests; that there was a certain time gap after he left Hickerson until the happening of the accident during which McKnight had the opportunity to stop for "drinks" and apparently had done so in view of McKnight's ready admission on the witness stand that he had served a jail sentence "in connection with [the] accident," as "they got [him] on three heads, negligent homicide, hit and run, and drunk driving." While McKnight maintained that he had not had any drinks after "12:00 or 1:00 p. m." that day and had made no stops other than for "boulevard signals" after he left Hickerson that night, until he had the accident about 10 p. m., such statements only produced a conflict with the significance of his admitted conviction on the "drunk driving" charge. Plaintiffs made no objection to this line of testimony given by McKnight as he was asked whether he had "ever been con-

victed of a felony,'' and it was only following his detailed
account of the basis of his ''jail sentence'' imposed by reason
of the accident, that the trial judge declared that ''it wasn't a
felony'' and ruled that ''the question and answer be stricken,''
consistent with the statement of counsel for defendant Thor-
ley that such procedure was ''agreeable with [him].'' In
such circumstances manifesting the intent to strike from the
record only ''the question and answer'' as to whether Mc-
Knight had ''ever been convicted of a felony,'' plaintiffs
unavailingly argue now that they ''had a right to assume that
*all* of the evidence concerning the nature of the crime that
the witness McKnight had been convicted of was stricken
from the record.''

The weight and sufficiency of the evidence, the con-
struction to be put upon it and the inferences to be drawn
therefrom were matters for the trier of the facts. (*Singh* v.
*Furuta,* 59 Cal.App.2d 695, 698 [139 P.2d 664]; *Shapiro* v.
*Equitable Life Assur. Soc.,* 76 Cal.App.2d 75, 96 [172 P.2d
725]; *Barham* v. *Khoury,* 78 Cal.App.2d 204, 211 [177 P.2d
579].)     Likewise questions as to the credibility of a
witness and the determination of conflicts and inconsistencies
in his testimony were for the trial judge. (*Hansen* v. *Bear
Film Co., Inc.,* 28 Cal.2d 154, 184 [168 P.2d 946]; *Purcell* v.
*Goldberg,* 34 Cal.App.2d 344, 347 [93 P.2d 578]; *Peterson* v.
*Peterson,* 74 Cal.App.2d 312, 319 [168 P.2d 474].)     A
witness ''may be contradicted by the facts he states as com-
pletely as by direct adverse testimony, and there may be so
many omissions in his account of particular transactions, or
of his own conduct, as to discredit his whole story. His man-
ner, too, of testifying, may give rise to doubts of his sincerity,
and create the impression that he is giving a wrong coloring
to material facts. All these things may properly be consid-
ered in determining the weight which should be given to his
statements, although there be no adverse verbal testimony
adduced.'' (*Burns* v. *Radoicich,* 77 Cal.App.2d 697, 700
[176 P.2d 77].)

In accord with these settled principles, plaintiffs'
challenge of the sufficiency of the evidence in support of the
trial judge's finding on the scope of employment issue can-
not prevail. The verity of McKnight's testimony was to be
tested by the trial judge in the light of all the facts and
circumstances, and he was free to disbelieve such parts of
the witness' account as appeared to him ''evasive, equivocal,

confused, or otherwise uncertain." (*Burns* v. *Radoicich, supra,* 77 Cal.App.2d 697, 701; see, also, *Shapiro* v. *Equitable Life Assur. Soc., supra,* 76 Cal.App.2d 75, 97; *Barham* v. *Khoury, supra,* 78 Cal.App.2d 204, 211.) In so appraising the factual situation here, the trial judge found on substantial evidence contrary to plaintiffs' claim as to McKnight's pursuit of his employer's business at the time of the happening of the accident, and such finding is conclusive on appeal. (See *Gomez* v. *Cecena,* 15 Cal.2d 363, 367 [101 P.2d 477]; *Hansen* v. *Bear Film Co., Inc., supra,* 28 Cal.2d 154, 184].)

It is true that because of the conflicting findings made in the two trials on the scope of employment issue, two opposite judgments arising from the same automobile accident have been entered, but the propriety of such result cannot be disputed. The same judge presided at both trials and, as the record here reveals, he expressly declared that in his opinion the evidence presented was "not . . . the same" in each instance, there was "different testimony" and "some testimony that wasn't in the other case." As the application of the principle of res judicata has been heretofore discussed, the prior adjudication of plaintiffs' cause of action against defendant Wilcox did not bind his copartners, defendants Bower and Thorley, who were not in legal privity with him, and consequently they were entitled to their day in court on the issues raised by the pleadings.

This is not a situation where (1) two conflicting judgments arising out of the same events were both before this court at the same time, (2) the essential facts were similarly presented, and (3) the evidence to a large extent was undisputed. (*Inyo Chemical Co.* v. *City of Los Angeles,* 5 Cal.2d 525 [55 P.2d 850]; *Southern Pac. Co.* v. *City of Los Angeles,* 5 Cal.2d 545 [55 P.2d 847].) With such prevailing combination of factors, this court recognized the anomaly of "two lower courts dealing with substantially the same evidence" and "reaching diametrically opposite conclusions as to the legal effect of the same occurrence," and therefore the two conflicting judgments were not permitted to stand. (*Southern Pac. Co.* v. *City of Los Angeles, supra,* p. 548.) But here, (1) the judgment entered on the first trial has long since become final and only the judgment entered on the second trial is presented for review; and (2) it cannot be said from the record that the "essential facts" were "similarly presented" in the second trial and were "in most particulars undisputed." (*Ibid.*) Rather, to the latter point the contrary appears, for

the trial judge plainly correlated his opposing views in disposition of factual conflicts in the case with the observation that in his opinion the evidence in the two trials was "not . . . the same" and there was "different testimony." Accordingly, this court is in no position to undertake the elimination of any inconsistency between the findings entered upon the conclusion of the respective trials and achieve a harmonious result premised upon the determination of the legal effect of "substantially the same evidence." (*Ibid.*; see *Ferroni* v. *Pacific Finance Corp.,* 21 Cal.2d 773, 780 [135 P.2d 569].) In these circumstances, and in view of the record's disclosure of substantial evidence in support of the challenged finding, plaintiffs cannot prevail on this appeal. (*Morris* v. *Fortier,* 59 Cal.App.2d 132, 136-138 [138 P.2d 368]; see, also, *Shutz* v. *Western Wholesale Liquor Dist.,* 24 Cal.App.2d 659, 664 [76 P.2d 135].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.